**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR GUARANTY BANK

                                Plaintiff,

              -against-

U.S. BANK NATIONAL ASSOCIATION,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 15-cv-6570

Hon.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................ 1

PARTIES ................................................................................................................... 7

JURISDICTION AND VENUE .................................................................................. 8

FACTUAL ALLEGATIONS ...................................................................................... 8

    I.      THE SECURITIZATION PROCESS .................................................... 8

    II.    US BANK'S DUTIES AND OBLIGATIONS ...................................... 10

          A.    US Bank's Duties Pertaining to the Delivery of Mortgage Files ............... 11

          B.    US Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice ................... 13

          C.    US Bank Had a Duty to Act Prudently to Enforce Repurchase Obligations ........................................... 15

          D.    US Bank Had a Duty to Provide Accurate Remittance Reports ............... 16

          E.    US Bank Had a Duty to Address the Servicer's Failure to Meet Requisite Servicing Standards ........................ 16

    III.   US BANK BREACHED ITS CONTRACTUAL AND STATUTORY DUTIES ................................................ 17

          A.    US Bank Failed to Take Possession of Complete Mortgage Files ............ 17

          B.    US Bank Was Aware of but Failed to Provide Notice of the Sponsor's and Originator's Pervasive Representation and Warranty Breaches .................................... 19

                1.    US Bank Obtained Information During Its Administration of RMBS Trusts Alerting It to Widespread Breaches of Representations and Warranties ........ 21

                2.    US Bank Was Aware of Rating Downgrades and High Level of Defaults ........................................ 24

                3.    US Bank Was or Should Have Been Aware of Originator's and Sponsor's Pervasive Breaches ............ 25

4.      If US Bank Had Performed Its Duties,
        It Would Have Obtained Further Evidence
        of Breaches of Representations and Warranties ...........................26

C.      US Bank Failed to Act Prudently to Enforce Repurchase Obligations .....28

        1.      Events of Default Relating to Document Delivery .......................29

        2.      Events of Default Concerning False Servicer Certifications .........30

D.      US Bank Failed to Address the Servicer's Excessive
        Charges for Default Services that Diminished Trust Assets.....................31

IV.     US BANK'S CONDUCT INJURED PLAINTIFF.................................................32

CAUSES OF ACTION ..................................................................................................35

FIRST CAUSE OF ACTION
(Breach of Contract) ....................................................................................................35

SECOND CAUSE OF ACTION
(Violation of the Streit Act) .........................................................................................36

THIRD CAUSE OF ACTION
(Violations of the TIA) ................................................................................................38

PRAYER FOR RELEIF .................................................................................................40

JURY TRIAL DEMANDED ..........................................................................................41

Plaintiff Federal Deposit Insurance Corporation as Receiver for Guaranty Bank ("Plaintiff" or "FDIC-R"), by and through its attorneys, brings this action against Defendant U.S. Bank, N.A. ("US Bank," "Defendant," or the "Trustee"), and alleges as follows:

## NATURE OF ACTION

1.     This is an action for damages against US Bank for its breaches of contractual and statutory duties under the governing agreements, the New York Streit Act, N.Y. Real Property Law § 124, *et seq*. (the "Streit Act"), and under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq*.[1] as Trustee for two securitization trusts, Harborview Mortgage Loan Trust, Pass-Through Certificates, Series 2005-8 ("HVMLT 2005-8") and Harborview Mortgage Loan Trust, Pass-Through Certificates, Series 2005-16 ("HVMLT 2005-16") ( collectively the "Covered Trusts"), which issued residential mortgage-backed securities ("RMBS") purchased by investors, including Guaranty Bank ("Guaranty").

2.     This action seeks to hold US Bank accountable for abdicating its fundamental duties as the trustee to certificateholders such as Plaintiff.  Under the agreements governing the Covered Trusts, US Bank accepted virtually all of the powers designed to protect the certificateholders and was compensated for that role.  US Bank was essentially Plaintiff's sole source of protection against breaches of the governing agreements by the other parties to those agreements, including the sponsor that sold the loans to the Covered Trusts and the servicer tasked with servicing the mortgage loans.  US Bank, however, shirked its duty to exercise its powers to protect Plaintiff and instead attempted to shorn itself of the responsibilities that

---

[1] Plaintiff acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to the RMBS at issue here.  Plaintiff includes a claim under the TIA to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

trusteeship imports.  While US Bank stood idly for years, the sponsor kept defective mortgage

loans in the Covered Trusts, the servicer reaped excessive fees for servicing the defaulted loans

from the Covered Trusts, and Plaintiff was left to suffer enormous losses.

3.      The Covered Trusts were created to facilitate RMBS transactions sold to

investors in 2005.  Both of the RMBS transactions were sponsored by Greenwich Capital

Financial Products, Inc. (referred to herein as the "Sponsor"), and contained loans originated

by Countrywide Home Loans, Inc. ("Countrywide" or the "Originator").

| Trust | Short Title | Depositor | Sponsor |
|---|---|---|---|
| Harborview Mortgage Loan Trust, Pass-Through Certificates, Series 2005-8 | HVMLT 2005-8 | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |
| Harborview Mortgage Loan Trust, Pass-Through Certificates, Series 2005-16 | HVMLT 2005-16 | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. |

4.      Prior to its failure, Guaranty purchased the RMBS certificates at issue in this

action with a purchase price of over $248 million (the "Certificates") as set forth below:

| Deal Name | CUSIP | Tranche | Purchase Date | Purchase Price |
|---|---|---|---|---|
| HVMLT 2005-8 | 41161PRT2 | 2A3 | July 29, 2005 | $204,000,000.00 |
| HVMLT 2005-16 | 41161PZD8 | 4A1B | December 30, 2005 | $44,634,891.86 |

5.      The Certificates represent interests in the cash flows associated with the

mortgage loans deposited into the Covered Trusts by the Sponsor and its affiliates or

business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The

quality of the mortgage loans deposited into the Covered Trusts is critical, and numerous

provisions of the governing agreements assure that only qualifying loans would be deposited

into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

6.     The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, US Bank, to protect their contractual and other legal rights.

7.     As the Trustee for the Covered Trusts, US Bank owed investors, like Plaintiff, certain contractual duties, as well as duties under the Streit Act and the TIA, with respect to the mortgage loans owned by the Covered Trusts.  Among these duties are those set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs"), which were incorporated by reference into the certificates that US Bank signed, and under applicable state and federal laws.

8.     The Sponsor and Trustee typically had extensive business relationships. Nevertheless, as trustee, US Bank was obligated to act against the financial interest of the Sponsor when demanded by the circumstances.  The contractual right to have the Sponsor or the Originator replace or repurchase defective mortgage loans, and the duties of the Trustee to enforce such obligations and the other rights of investors in the Covered Trusts, was a significant protection received by investors in the Covered Trusts.  US Bank, however, failed in its obligations and breached its contractual and statutory obligations to protect the rights of investors such as Plaintiff.  As a result, Plaintiff has suffered material damages, which it seeks to recover in this action.

9.     US Bank breached its contractual and statutory duties in at least five different ways that caused Plaintiff to suffer damages.

10.     <u>First</u>, to ensure that the rights, title, and interest in the mortgage loans were perfected and properly conveyed to US Bank, the PSAs imposed duties on US Bank to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying incomplete mortgage loan files.  US Bank, however, systematically disregarded these contractual and statutory duties to enforce these rights on behalf of certificateholders.  If US Bank had met its contractual and statutory duties with respect to the non-compliant loans whose defects were not cured during the limited cure period, the Sponsor (or other obligated party) would have been required to substitute compliant loans for the loans with incomplete files, or repurchase the loans instead of having them remain in the Covered Trusts causing Plaintiff to incur significant losses.

11.     <u>Second</u>, US Bank had important notice obligations under the PSAs.  Upon discovery of any breach of the mortgage loan representations and warranties that materially and adversely affects the interests of certificateholders, US Bank was required to notify all the parties to the PSA of the breach, triggering the obligated party's duty to either cure the defect within the cure period or substitute or repurchase the loans.  US Bank failed to provide such notices.  If adequate notice of such breaches had been provided, the obligated parties would have been required to cure the breaches or repurchase the mortgage loans that did not comply with the applicable underwriting guidelines, and that ultimately caused a significant portion of Plaintiff's losses.  US Bank knew, or should have known, of the representation and warranty breaches and, thus, breached its obligation to provide notice.  Additionally, US Bank was obligated to notify the mortgage loan servicer when the server breached the PSAs, triggering the servicer's

obligation to cure the breach.  US Bank failed to do so.  Finally, US Bank failed to provide certificateholders notice, as required under the PSAs, of any Event of Default.

12.   Third, upon occurrence of an Event of Default, as defined under the PSAs, US Bank had a contractual and statutory duty to act prudently and exercise available remedies to protect the interests of certificateholders.  Having notice of the servicer's numerous defaults and Events of Default under the PSAs and breaches of the mortgage loan representations and warranties, US Bank should have prudently exercised all available remedies to ensure that certificateholders were adequately compensated.  If US Bank had acted prudently, it would have issued repurchase demands years ago and, if necessary, commenced litigation forcing the Originator (or other obligated party) to repurchase defective loans or pay for losses.

13.   Fourth, US Bank had a duty to provide accurate certifications and remittance reports where required under the PSAs, which incorporate applicable federal law.  US Bank failed to do so, failing to disclose the existence of defaults and breaches to Plaintiff causing injury to Plaintiff.

14.   Fifth, the PSAs required US Bank to take steps to protect Plaintiff whenever it became aware of uncured loan servicing failures by the Covered Trusts' servicer.  The servicer for both Covered Trusts was Countrywide Home Loans Servicing LP (the "Servicer").  The Servicer was supposed to ensure the proper servicing and administration of the mortgage loans in the Covered Trusts for the benefit of the certificateholders.  The PSAs required the Servicer (and its subservicers) to exercise customary loan servicing practices in servicing the mortgage loans.  The Servicer failed to meet these servicing standards because, among other things, it regularly overcharged for various default services

5

provided in connection with the mortgage loans and it failed to (i) promptly collect payments from borrowers and remit them to the Covered Trusts; (ii) promptly send delinquency notices to borrowers who were late on their payments; (iii) ensure the proper maintenance and reporting of accurate information regarding the mortgage loans; (iv) ensure the proper and prudent modification of mortgage loans when necessary; and (v) ensure the proper, prudent, correct, and truthful institution and prosecution of foreclosure proceedings. The excessive fees ultimately were paid out of the Covered Trusts.  US Bank failed to take steps to address these defaults, which damaged Plaintiff by increasing the loss severities for defaulted loans.

15.     US Bank's breaches of these duties give rise to three distinct legal claims.

16.     <u>Breach of Contract</u>.  US Bank breached the PSAs by failing to: (i) provide notice of the mortgage loan representation and warranty violations; (ii) provide notice of the Servicer's failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to the Trustee under the PSAs upon the occurrence of an Event of Default.

17.     <u>Violation of the Streit Act</u>.  US Bank violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of certificateholders during the pendency of an "event of default."  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.

18.     <u>Violation of the TIA</u>.  The TIA requires the trustee to provide

6

certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  US Bank violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and remedies available to them under the PSAs.

19.     By failing to perform these duties, US Bank has caused Plaintiff to suffer significant damages.  Plaintiff incurred these damages both before and in March 2010 when it sold the Certificates as part of a resecuritization transaction, Structured Sale of Guaranteed Notes 2010-S1 ("SSGN 2010-S1"), and suffered significant losses caused by US Bank's breaches of duties it owed Plaintiff.

## PARTIES

20.     Plaintiff, FDIC-R, is the receiver for Guaranty Bank, Austin, Texas.  The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions.  On August 21, 2009, Guaranty Bank was closed by the Office of Thrift Supervision and the FDIC was duly appointed as the receiver for Guaranty Bank.  Under the Federal Deposit Insurance Act, the FDIC as receiver succeeds to, and is empowered to use and complain in any court of law to pursue, all claims held by any bank for which it is the receiver.  12 U.S.C. §§ 1819, 1821(d)(2)(A)(i).  Thus, the FDIC as receiver for Guaranty Bank has authority to pursue claims formerly held by Guaranty Bank, including the claims made against Defendant in this action.

21.     Defendant US Bank is a national banking association organized and existing

under the laws of the United States.  US Bank does business throughout the United States, with its main office located in Ohio.  It serves as the trustee for the Covered Trusts.  For each of the Covered Trusts, US Bank signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, US Bank owed certificateholders certain statutory and contractual duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1811 *et seq.*, 12 U.S.C. § 1819 (b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  12 U.S.C. § 1819(b)(2)(A) provides that all suits to which the FDIC, in any capacity, is a party shall be deemed to arise under the laws of the United States.

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as US Bank resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

24.     This court has personal jurisdiction over US Bank because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the Covered Trusts are New York trusts governed by New York law.

## FACTUAL ALLEGATIONS

### I.     THE SECURITIZATION PROCESS

25.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are

deducted.

26.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as Greenwich Capital Funding Products, Inc., and the sale of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

27.     The depositor then conveys the pool of loans to a trustee, such as US Bank, pursuant to a PSA.  Each securitization includes various prioritized "tranches" of interests in payments to be made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, US Bank acted as the trustee in connection with the relevant RMBS transactions.

28.     Pursuant to the PSA for each trust, a "servicer" is obligated to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

29.     The trustee typically delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA. The contents of those reports are specified in the PSAs.  The servicer provides data to the trustee to include in these remittance reports.

30.     Each tranche in a loan securitization has a different level of risk and reward,

9

and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

31.　　Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

32.　　US Bank earned various forms of compensation in connection with its role as trustee, including typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  The RMBS trustee engagements further deepened US Bank's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.　　US BANK'S DUTIES AND OBLIGATIONS

33.　　US Bank's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  For the Covered Trusts, US Bank entered into the PSAs with (i) Greenwich Capital Acceptance, Inc., as depositor, and (ii) Greenwich Capital Financial Products, Inc., as Seller.

A.      **US Bank's Duties Pertaining to the Delivery of Mortgage Files**

34.      Each PSA sets forth a process for conveying the mortgage loans to the

Covered Trusts.  Typically, the Sponsor conveyed the loans to the depositor for the Covered

Trusts.  Then the depositor conveyed the mortgage loans to US Bank in its capacity as the

trustee for the Covered Trusts to hold for the benefit of certificateholders.  This process is

set forth in Section 2.01 of the HVMLT PSA, which provides in relevant part:[1]

> Concurrently with the execution and delivery of this Agreement,
> the Depositor does hereby assign to the Trustee all of its rights
> and interest under the Mortgage Loan Purchase Agreement,
> including all rights of the Seller under the Servicing Agreement
> to the extent assigned in the Mortgage Loan Purchase
> Agreement.  The Trustee hereby accepts such assignment, and
> shall be entitled to exercise all rights of the Depositor under the
> Mortgage Loan Purchase Agreement and all rights of the Seller
> under the Servicing Agreement as if, for such purpose, it were
> the Depositor or the Seller. . . .

35.      In addition, Section 2.02 of the HVMLT PSA provides that the Trustee is

required to take physical possession of the mortgage loans and the accompanying mortgage

files for the exclusive use and benefit of all current and future certificateholders:

> The Trustee, by execution and delivery hereof, ***acknowledges
> receipt*** by it or by the custodian on its behalf of the Mortgage
> Files pertaining to the Mortgage Loans listed on the Mortgage
> Loan Schedule, subject to review thereof by the Custodian on
> behalf of the Trustee and declares that it holds or will hold all
> other assets included in the definition of "Trust Fund" in trust for
> the exclusive benefit of all present and future Certificateholders.

(Emphasis added.)

36.      Section 2.01 of the HVMLT PSA also specifically sets forth the operative

documents that must be contained in the mortgage file for the mortgage loans, including, but

---

[1] Quotations to the HVMLT PSA herein are to the PSA executed in connection with the HVMLT 2005-8
securitization.  The HVMLT 2005-16 securitization was issued pursuant to a PSA with substantially
similar language and any differences are immaterial to the issues addresses in this Complaint.

not limited to, the original mortgage note, the original recorded mortgage or certified copy thereof, a duly executed assignment of the mortgage together with any interim assignments of the mortgage, and the lender's title policy.

37.     Physical possession of these documents by US Bank was necessary to transfer the ownership rights to the mortgage loans from the Sponsor and depositor to the Covered Trusts.

38.     After a designated period, US Bank, or a document custodian as agent for US Bank, was required to issue a final certification and attached document exception report. The final certification is the key certification that US Bank, or the Custodian as its designated agent, was required to prepare for the Covered Trusts.  In this document, US Bank or its designated agent certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) US Bank had not obtained complete required documentation for those loans identified on the document exception report.  *See* HVMLT PSA § 2.02.  The form of final certification was attached to the HVMLT PSA as Exhibit G-3.

39.     If there was a defect with any mortgage file, then US Bank was obligated to demand that the Originator cure the defect leading to the exception during the cure period or repurchase or substitute the defective loans.  This is set forth in Section 2.03 of the HVMLT PSA, which provides:

> *Upon its discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originator of any representation, warranty or covenant under the Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the*

> *interest therein of the Certificateholders, the Trustee shall promptly notify the Originator of such defect, missing document or breach* and request that the Originator deliver such missing document or cure such defect or breach within 90 days from the date that the Seller was notified of such missing document, defect or breach, *and if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the Originator's obligation under the Purchase Agreement and cause the Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price* (as defined in the Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period. . . .

(Emphasis added.)

### B. US Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice

40.     As a party to the PSAs, US Bank had an obligation pursuant to the PSAs to provide notice to all parties of other parties' breaches of representations and warranties under the PSAs.  For example, Section 2.03 of the HVMLT PSA provides:

> Upon its discovery . . . of the breach by the Originator of any representation, warranty or covenant under the Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, *the Trustee shall promptly notify the Originator of such defect, missing document or breach* and request that the Originator deliver such missing document or cure such defect or breach within 90 days from the date that the Seller was notified of such missing document, defect or breach, and if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the Originator's obligation under the Purchase Agreement and cause the Originator to repurchase that Mortgage Loan from the Trust Fund at the Repurchase Price (as defined in the Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period. . . .

(Emphasis added.)

41.     The PSAs require that US Bank provide notice to the Servicer of breaches of representations and warranties or covenants made by the Servicer.  Section 7.01 of the HVMLT PSA provides that most breaches by the Servicer ripen into an Event of Default if left unremedied for sixty days after the Trustee "deliver[s] written notice to the Servicer of the Event of Default on any Servicer Remittance Date on which the Servicer fails to make any deposit or payment required pursuant to the Servicing Agreement."  This provision clearly contemplates that the Trustee "shall" provide notice of Servicer breaches upon becoming aware of such breaches, which makes sense as the Trustee was the party required to police the deal for investors.

42.     Under Section 7.04 of the HVMLT PSA, "[n]o later than 60 days after the occurrence of any . . . Event of Default of which a Responsible Officer of the Trustee becomes aware . . . , the Trustee shall transmit by mail to . . . all Certificateholders notice of such occurrence . . . ."

43.     Additionally, Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

44.     Under Section 315(b) of the TIA, US Bank was required to give certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

45.     As set forth in Section III below, US Bank failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

14

### C.      US Bank Had a Duty to Act Prudently to Enforce Repurchase Obligations

46.     Under the PSAs, the Streit Act, and the TIA, US Bank owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default.  US Bank's post-default contractual duties are described in Section 8.01 of the HVMLT PSA, which provides in relevant part, "[if] an Event of Default has occurred . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under circumstances in the conduct of his own affairs."

47.     The Streit Act provides that upon the occurrence of an "Event of Default," as that term is defined in the trust indenture, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  The Streit Act also requires trustees to avoid conflicts of interest.[2]

48.     A prudent trustee would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.  A prudent trustee also would have ensured that the appropriate parties were receiving notification of breaches of representations and warranties from the servicer and enforced the responsible parties' obligations with respect to breaching mortgage loans.  As set forth in Section III below, US Bank failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

---

[2] In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

**D.      US Bank Had a Duty to Provide Accurate Remittance Reports**

49.      Each PSA requires US Bank to forward to rating agencies and to make available to certificateholders monthly remittance reports describing the performance of underlying loans.  Section 5.04 (a) of the HVMLT PSA provides that:

> On each Distribution Date, the Trustee shall make available to each Certificateholder, the Certificate Insurer, the Seller and the Rating Agency, a statement based, as applicable, on loan-level information obtained from the Servicer (the "**Distribute Date Statement"**) as to the distributions to be made or made, as applicable, on such Distribution Date.

**E.      US Bank Had a Duty to Address the Servicer's Failure to Meet Requisite Servicing Standards**

50.      Each PSA requires the Servicer to service the loans underlying the Covered Trusts prudently.

51.      Section 3.01 of the HVMLT 2005-8 PSA provides: "The Servicer will service the Mortgage Loans pursuant to the terms of the Servicing Agreement."  The Servicing Agreement requires the Servicer to meet specified servicing standards in servicing the loans.

52.      The PSAs for the Covered Trusts provide that failure to meet the required servicing standards is an Event of Default if left uncured for a designated period of time (60 days) after notice of the default.  *See* HVMLT PSA § 7.01.

53.      Upon a Servicer default or Event of Default, the Trustee was obligated to act. As discussed above in Section II(B), US Bank had a duty to provide notice when it became aware of breaches of the PSAs by the Servicer.  If the defaults were not cured within the grace period, the Trustee was required to take action to address the defaults.  Further, the Trustee cannot avoid its duties after the grace period because it failed to give the required notice of defaults.  For example, the HVMLT PSA provides that once an Event of Default

16

occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations of the Servicer," HVMLT 2005-8 PSA § 7.01, and "be the successor in all respects to the Servicer in its capacity as servicer under the Servicing Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer." HVMLT PSA § 7.02. More generally, US Bank, as Trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so prudently. HVMLT PSA § 8.01.

54.    As set forth in Section III below, US Bank breached its contractual duties by failing to take actions to address Servicer defaults and Events of Default.

## III.    US BANK BREACHED ITS CONTRACTUAL AND STATUTORY DUTIES

### A.    US Bank Failed to Take Possession of Complete Mortgage Files

55.    US Bank breached its contractual duties under the PSAs by failing to cause the obligated parties to repurchase or substitute for loans that, based on information and belief, were listed on final exception reports with defects, but were not cured within the required period.

56.    US Bank's failure was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010. Professor Levitin described the implications of the failure by a securitization trustee such as US Bank to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of

17

mortgages into securitization trusts.

\*       \*       \*

Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

\*       \*       \*

If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities. In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

*Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs* (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).

57.     It would have been obvious to a reasonably competent trustee performing its contractual duties with due care that, for example, the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the mortgage loan originator to US Bank, or there was no duly executed assignment of the mortgage to US Bank, or the original lender's title policy was missing. In many cases, US Bank likely identified these obvious defects and noted them on the final exception reports for the Covered Trust, but, upon information and belief, it did not require that they be corrected.[3]

---

[3] To the extent US Bank failed to properly list required documentation exceptions on the final exception reports, that failure would be an additional breach of its duties under the PSA.

58.     Based on information and belief, US Bank knew of numerous instances where it did not receive the original mortgage note with all intervening endorsements that showed a complete chain of endorsement from the Originator to the Sponsor or depositor or a lost mortgage note affidavit, as well as a duly executed assignment of mortgage for each loan that was not a MERS loan, the original recorded mortgage for each loan that was not a MERS loan, the original mortgage for those loans that were MERS loans, or the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.  When those defects were left uncured after the expiration of the contractual cure period, a prudent trustee would have, at a minimum, sought repurchase of all defaulted loans with incomplete mortgage files.

59.     Additionally, US Bank commenced foreclosure actions in 2005-2008 which highlighted the Originator's pervasive document delivery issues.  *See, e.g.*, *Feltus v. U.S. Bank Nat'l Ass'n.*, 80 So.3d 375 (Fla. Ct. App. 2012) (reversing summary judgment and raising issue of whether Countrywide assigned mortgage note to U.S. Bank).

**B.      US Bank Was Aware of but Failed to
          Provide Notice of the Sponsor's and Originator's
          Pervasive Representation and Warranty Breaches**

60.     US Bank failed to give notice of breaches of representations and warranties provided by the Originator concerning the mortgage loans backing the Covered Trusts.

61.     For example, the HVMLT PSA provides that the Seller represented and warranted the following:

> (i) Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

(ii) No Mortgage Loan is a "High Cost Loan" or "Covered Loan," as applicable, (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary, Appendix E, in effect as of the Closing Date) and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act;

(iii) With respect to each representation and warranty with respect to any Mortgage Loan made by the Originator in the Purchase Agreement that is made as of the related Closing Date (as defined in the Purchase Agreement), to the Seller's knowledge, no event has occurred since the related Closing Date (as defined in the Purchase Agreement) that would render such representations and warranties to be untrue in any material respect; and

(iv) Each Loan Subgroup 1-A1 and Loan Subgroup 2-A1 Mortgage Loan has an original principal balance that conforms to Freddie Mac guidelines in effect as of the Closing Date.

HVMLT PSA § 2.04.

62.    The referenced Purchase Agreement is a contract in which the seller purchases mortgage loans from the Originator, and the seller then assigns all of its rights under the Purchase Agreement, including with respect to representations and warranties made by the Originator with respect to the quality and characteristics of the mortgage loans, to US Bank as Trustee.  While the Purchase Agreements for the loans in the Covered Trusts are not publicly available, upon information and belief, they will contain numerous standard mortgage loan representations and warranties, including that the mortgage loans comply with applicable underwriting guidelines.

63.    As noted above in Section II(B), US Bank had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Originator's obligation to repurchase or substitute the defective loan.

64.    If US Bank had provided notice of the widespread representation and warranty violations, the Originator would have been forced to repurchase the affected loans.

### 1. US Bank Obtained Information During Its Administration of RMBS Trusts Alerting It to Widespread Breaches of Representations and Warranties

65.     Through its role as trustee US Bank knew or should have known that the Originator regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

66.     US Bank served as trustee for hundreds of RMBS trusts from 2004-2007, including many transactions involving the Originator.  In the course of administering these trusts, US Bank learned that the Originator had departed from its underwriting guidelines, engaged in predatory lending, and failed to ensure the mortgage loans complied with state and federal law.

67.     For example, while serving as trustee for various RMBS trusts, US Bank was presented with a large number of defaulted loans that were originated by the Originator and foreclosures were often commenced in US Bank's name.  While a default alone does not demonstrate a breach of representation and warranty, US Bank, unlike certificateholders, was a party to foreclosure actions.  Through its review of these filings, US Bank knew or should have known that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

68.     Foreclosure actions were commenced in US Bank's name for numerous loans in which the origination practices were at issue.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Weber*, No. 2007-cv-01644 (C.P. Montgomery Cnty. 2007); *U.S. Bank Nat'l Ass'n v. Houston*, No. 2007-cv-03070 (C.P. Montgomery Cnty. 2007).

69.     Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, US Bank had a duty to examine foreclosure

filings and was responsible for the acts of the Servicer because it filed actions in the name of US Bank and was acting on behalf of US Bank.  Having lent its name to the foreclosure proceedings, US Bank had a duty to review and approve filings and therefore should have learned about the problems with the mortgage loans revealed by those proceedings.

70.     In its role as Trustee, US Bank also commenced repurchase actions against the Originator at issue here (but none involving a Covered Trust).  *See, e.g.*, Compl., *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011). In this repurchase action brought by US Bank, loan level reviews were conducted which identified breach rates with respect to loans originated during the same period as the loans in the Covered Trust as high as 99%.

71.     Further, in *U.S. Bank National Association, as Trustee for HarborView Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc. et al.*, Index No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011), US Bank sought repurchase of Countrywide loans included in a different securitization from the same shelf as the Covered Trust, HVMLT 2005-10.  In its complaint, US Bank stated that "[s]oon after being sold to the Trust, Countrywide's Loans began to become delinquent and default at a startling rate."  US Bank stated that a forensic review conducted before filing the complaint resulted in "an extraordinary sixty-six percent" of the sampled loans breaching one or more of the mortgage loan representations and warranties.  US Bank stated that this was consistent with "Countrywide's abject failure to abide by the very representations and warranties it consistently made to induce the purchase of its Loans for securitizations, including the purchase of the Loans by the Trust."

72.     Armed with knowledge gained from its role as trustee of "Countrywide's abject failure to abide by the very representations and warranties it consistently made to induce the

purchase of its Loans for securitizations," along with the ability to request and review mortgage loan files, US Bank also should have taken actions to protect the certificateholders in the Covered Trusts which were from the same HVMLT securitization shelf and included the same type of Countrywide loans.

73.     Additionally, US Bank's interaction with monline insurers in the course of administering its trusteeship duties likely would have added to its knowledge of issues with Countrywide loans.

74.     Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

75.     Since 2009, monoline insurers such as Ambac, Financial Guaranty Ins. Co., and MBIA have filed billions of dollars of claims against Countrywide for breaches of its representations and warranties in connection with securitized mortgages.

76.     Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

77.     Pursuant to typical agreements governing the relevant RMBS transactions, monoline insurers would have provided US Bank with notice of breaches of representations and warranties for specific mortgage loans in trusts for which US Bank was trustee prior to filing lawsuits.

23

>           2.      US Bank Was Aware of Rating
>                   Downgrades and High Level of Defaults

78.     Apart from the notices it received from investors, there were various other

indications that should have caused US Bank to investigate whether the Covered Trusts' loan

pools included mortgage loans that materially breached the responsible party's representations

and warranties.  For example, the Originator's pervasive abandonment of underwriting

guidelines has had a devastating effect on the performance of the Covered Trusts.  Both of the

Certificates acquired by Plaintiff were triple-A rated at the time of purchase.  Subsequently,

both of them were downgraded to "junk" bonds that did not qualify for any investment grade

rating.  The downgrades are shown below:

| Deal Name | Rating at Guaranty's Purchase | Current Rating | Date downgraded below investment grade |
|---|---|---|---|
| HVMLT 2005-8 | AAA/Aaa | D/Ca | February 20, 2009 |
| HVMLT 2005-16 | AAA/Aaa/AAA | D/C/D | December 18, 2008 |

79.     These downgrades were prompted by the alarming rate of defaults and

delinquencies of the mortgage loans backing the Covered Trusts.  In addition to the other

information that US Bank was aware of due to its position as trustee set forth herein, US Bank

was aware of the high level of defaults and should have carefully investigated these issues, notified

certificateholders, including Plaintiff, of the issues, and taken action to address these issues.

80.     A loan that defaults shortly after origination can be an indicator that it was not

underwritten in accordance with underwriting guidelines.  An analysis of the early payment

default ("EPD") rates for loans underlying Guaranty's RMBS, data available to the trustee,

shows strong evidence that the loans were not underwritten in accordance with underwriting

guidelines.  The results are shown below:

| Defaults Occurring With the First 18 Months | | | |
|---|---|---|---|
| Security | 6 Months EPD | 12 Months EPD | 18 Months EPD |
| HVMLT 2005-08 | 11.4% | 18.0% | 24.9% |
| HVMLT 2005-16 | 13.7% | 22.1% | 29.8% |

### 3.     US Bank Was or Should Have Been Aware of Originator's and Sponsor's Pervasive Breaches

81.     As a result of its role as trustee, US Bank had knowledge of specific problems with specific loans as well as access to the mortgage loan files.  At a minimum, in its role as trustee to hundreds of RMBS trusts, US Bank was privy to information that would have provided the scent of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, US Bank had statutory and common law duties requiring it to nose to the source.

82.     US Bank was aware or should have been aware of reports, investigations, and lawsuits concerning the Originator, Countrywide, for the Covered Trusts.  These reports would have raised the suspicions of a prudent trustee, causing them to act particularly in light of the fact that US Bank was aware of skyrocketing defaults, early payment defaults, and received information concerning the Sponsor and Originator.  US Bank failed to respond to these red flags.

83.     For example, prior to March 2010, US Bank was aware of or should have been aware of public information showing widespread breaches of the mortgage loan representations and warranties with respect to loans originated by Countrywide—the originator of the loans comprising the Covered Trusts.  This information included Countrywide documents that were

made public by the SEC in 2009 and public statements by former employees incriminating Countrywide of failing to comply with the mortgage loan representations and warranties.

84.     By March 2010, US Bank was aware of or should have been aware of similar public information revealing widespread breaches of the mortgage loan representations and warranties by the Sponsor, Greenwich Capital Financial Products, Inc. (a subsidiary of Royal Bank of Scotland, which changed its name to RBS Financial Products Inc. in April 2009).  This information included investigations by several state attorneys general into Greenwich Capital Financial Products, Inc.'s financing, purchasing, and securitizing residential mortgage loans.

85.     Unlike certificateholders, such as Plaintiff, US Bank had the ability to look beyond this public information because, based on information and belief, it received notice of mortgage loan re-underwriting findings from monoline insurers.  US Bank had the ability to request the mortgage loan files for the loans in the Covered Trusts and independently review them.

**4.     If US Bank Had Performed Its Duties, It Would Have Obtained Further Evidence of Breaches of Representations and Warranties**

86.     If US Bank did nose to the source of the information it learned concerning widespread breaches of representations and warranties by the Sponsor and Originator for the Covered Trusts, US Bank would have readily identified further evidence of specific breaches of the mortgage loan representations and warranties.

87.     Based on an analysis of a random sample of loans in the Covered Trusts that eventually became possible to conduct when adequate tools were introduced to the marketplace, FDIC-R identified numerous breaches of mortgage loan representations and warranties that FDIC-R was able to test without access to mortgage loan files.

88.     The mortgage loan representations and warranties incorporated in the PSAs, upon information and belief, provide (as would be typical) that none of the mortgage loans in the Covered Trusts were permitted to have a loan-to-value ("LTV") ratio over 100%.  The FDIC-R's analysis showed that 67 loans (or 13 percent of the sampled loans) contained LTV ratios over 100 percent.[4]

| Results of LTV Analysis for Sample Loans for US Bank Trusts | | | |
|---|---|---|---|
| Security | No. of properties with adequate data to determine TMV | Loans with LTVs >100% per Pro-Supp | Loans with LTVs >100% per AVM |
| HVMLT 2005-16 | 262 | 0 | 45 |
| HVMLT 2005-8 | 250 | 0 | 22 |

89.     The mortgage loan representations and warranties incorporated in the PSAs, upon information and belief, also provide (as would be typical) that the mortgage loans would comply with the mortgage loan characteristics, including owner occupancy, reported in the prospectus supplements.  The investigation tested the accuracy of the representation that loans were owner-occupied by examining indicia that the properties were not primary residences, such as a borrower's bills being sent to a different address, a borrower not designating property as a homestead, or a borrower's tax bills not being sent to the property address.  Based on this analysis, the number of owner occupancy breaches in the sampled loans range from 33.2 percent to 38 percent as shown below.

---

[4] Using a comprehensive, industry-standard automated valuation model ("AVM"), it was possible to determine the "true market value" of a certain property as of a specified date and thereby test whether any of the LTV ratios for the sampled loans were over 100%.

| Results of Owner-Occupancy Analysis for Sample Loans for US Bank Trusts | | | | | | |
|---|---|---|---|---|---|---|
| Certificate | Properties Represented To Be Owner-Occupied | Bills Sent to Different Address | Property Not Designated as Homestead | Tax Bills Not Sent to Property Address | Sample Loans with At Least One Problem Noted in Prior 3 Columns | Percent Indicated To Have Incorrect Occupancy Designation |
| HVMLT 2005-16 | 361 | 59 | 80 | 24 | 137 | 38.00% |
| HVMLT 2005-8 | 334 | 47 | 71 | 30 | 111 | 33.20% |

90.     Given that US Bank had access to the actual mortgage loan files, US Bank could have evaluated compliance with the full set of the mortgage loan representations and warranties incorporated in the PSAs, which likely would have revealed far more breaches of the mortgage loan representations.

**C.     US Bank Failed to Act Prudently to Enforce Repurchase Obligations**

91.     Events of Default occurred under each of the PSAs, but US Bank failed to take the required actions to protect the rights of the certificateholders.

92.     First, as set forth in Section III(B), US Bank was aware (or would have been aware if it had carried out its duties) that the parties to the PSAs (including US Bank itself) failed to provide notice of the representation and warranty violations that occurred in the Covered Trusts.  This failure itself was a default under the PSAs for which US Bank was required to provide notice, triggering an Event of Default to the extent that the defaults were left unremedied.  Given that US Bank cannot avoid the occurrence of an Event of Default by shirking its duty to fulfill the condition precedent and provide notice under the PSAs, these defaults all ripened into Events of Default.  As a result, US Bank had the duty to prudently

exercise all available remedies, including the enforcement of the repurchase provisions in the PSAs.

93.     Additionally, when US Bank learned that the Servicer failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, US Bank should have (i) taken action against the Servicer; (ii) taken steps to require the Originator to repurchase or substitute the loans; and (iii) notified certificateholders of the Servicer's default and the breaches of representation and warranty provisions.

94.     As described below, additional Events of Default occurred under the terms of the PSAs.

### 1.     Events of Default Relating to Document Delivery

95.     Events of Default occurred shortly after the closing of the RMBS transactions because the Servicer's failure to cause the repurchase or substitution of loans with document exceptions constituted a breach of its servicing obligations.  Each PSA requires that the Servicer's failure to adhere to the required servicing standards ripens into an Event of Default if left uncured within a specified period after notice by the Trustee of such breach.  HVMLT PSA § 7.04.  Rather than taking a loss on loans that were eligible for repurchase, a prudent servicer would have caused the responsible party to repurchase them.  Instead, the Servicer liquidated loans with document exceptions.  US Bank was aware of this fact as it was aware of the contents (or would have been aware of the contents had it exercised its contractual obligations) of the document exception reports and that properties with exceptions had defaulted and not been repurchased or substituted.  However, US Bank did not provide notice as it was required to do. Having failed to provide the required notice, US Bank had an obligation to act prudently to address all defaults.

96.     Despite the existence of uncured Events of Defaults, US Bank did not adequately address the defaults and Events of Default.  If US Bank had acted prudently, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the Originator and caused it to repurchase or substitute the affected loans.  US Bank's failure to do so continued during the period that Plaintiff held the RMBS and damaged Plaintiff.

### 2.      Events of Default Concerning False Servicer Certifications

97.     Each PSA obligated the Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations.  Section 3.05 of the HVMLT PSA requires the Servicer to annually certify its compliance with its obligations under the Servicing Agreement and provide a Servicer's back-up certification pursuant to the Purchase Agreement.

98.     The failure to provide a conforming certification ripens into an Event of Default under the PSAs for both Covered Trusts if left uncured after a specified period of time.  US Bank received and accepted certifications that it knew to be false because the Servicer was not in fact meeting their obligations under the PSAs.  As discussed above, the Servicer breached the PSAs in many ways, including by attempting to foreclose on defective loans rather than tendering loans for repurchase or substitution and overcharging borrowers for default services (the cost of which were ultimately taken from the Covered Trusts).  US Bank was aware or should have been aware of these breaches and therefore knew the required Servicer certifications did not conform because they were false.  Events of Default were triggered as a result and US Bank had a continuing duty to act prudently to protect the certificateholders' interests.

### D.      US Bank Failed to Address the Servicer's Excessive
### Charges for Default Services that Diminished Trust Assets

99.      In addition to the servicing related defaults and Events of Default described above, the Servicer and its successor has engaged in a variety of practices that resulted in overcharging defaulted borrowers that US Bank failed to address.  These practices have increased loss severities on defaulted mortgages and, as a result, increased Plaintiff's losses.

100.      As an initial matter, to the extent that the PSAs and agreements for the Covered Trusts permitted loans to be modified without requiring repurchase by the Originator, upon information and belief, the Servicer did not modify loans when it was in the Covered Trusts' interest to do so rather than foreclose.

101.      It has been widely reported that the Servicer for the Covered Trusts has overcharged borrowers after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, and procuring insurance policies for properties that were already insured.  As a result the Servicer received excess fees from borrowers (and ultimately the Covered Trusts) for default-related services.

102.      Improper foreclosure practices have been the subject of many government investigations and settlements, including, for example, a Consent Order between the Office of the Comptroller of the Currency and Bank of America/Countrywide entered in April 13, 2011 and a $25 billion settlement that Bank of America/Countrywide (along with JPMorgan, Citibank, Ally Financial, and Wells Fargo) entered with 49 state Attorneys General.[5]

---

[5] *See* Consent Order, *In the Matter of Bank of America, N.A.*, *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf; Department of Justice Press Release, Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses, Feb. 9, 2012, *available at*

103.    These excessive and often unnecessary fees were ultimately paid by certificateholders because when a defaulting borrower's home is foreclosed upon and sold, the servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

104.    These overcharges are improper and resulted in breaches under the PSAs because they do not meet the prudent servicing standard.  As noted in Sections II(E) and III(C), servicing related defaults known to US Bank triggered its duty to act prudently.  US Bank was or should have been aware of allegations of these widespread servicing abuses, and, upon information and belief, if US Bank had investigated, it would have discovered that serious servicing abuses impacted the loans in the Covered Trusts.

## IV.    US BANK'S CONDUCT INJURED PLAINTIFF

105.    By March 2010 it was apparent that US Bank failed to act in the interests of certificateholders.  RMBS market participants were aware of this fact by March 2010 as reflected in market publications.  As an example, in a white paper issued in March 2010 titled *Reforming the Asset-Backed Securities Market*, the American Association of Mortgage Investors (consisting of many RMBS investors) observed:

> Right now, trustees of collateral pools play a largely passive role and bear little if any accountability to the holders of securities which they have agreed – and are being compensated – to serve.  In practice they do not supervise the servicers of collateral pools, who are often affiliated with the loan originators and therefore have strong incentives not to enforce representation and warranty claims on behalf of investors.

---

http://www.justice.gov/opa/pr/federal-government-and-state-attorneys-general-reach-25-billion-agreement-five-largest.

106.    The white paper further reflected this market understanding when it went on to

state:

> If one considers that the trustee of a securitization is like the board
> of directors of a company and the servicer of a collateral pool is
> functionally like the management, then it must be stated that
> holders of asset-backed securities are not given the protective
> rights, relative to those expected to serve them, that shareholders
> are provided. Securitization legal structures may utilize trustees
> and holders of asset-backed securities may have their rights shaped
> by contracts, but these holders are collectively the equity of the
> trust and they are owed fiduciary duties which must be respected.
> At least shareholders have the right to find out who their fellow
> security holders are, the right to an annual meeting, and the right to
> remove and elect new directors. Holders of asset-backed securities
> have none of these rights.

107.    Because the market had concluded that defaulted loans would result in

significant principal write-downs for the Certificates, market values for the Certificates were

well below par in March 2010.  The trading price for HVMLT 2005-8 was 41.4 percent of the

current face value and the trading price for HVMLT 2005-16 was just 28.4 percent of current

face value in March 2010.

108.    On March 11, 2010, Plaintiff sold the Certificates as part of a resecuritization

transaction, SSGN 2010-S1, and suffered over $55 million in loss on the Certificates.  The sale

was made pursuant to a Trust Agreement by and among the Federal Deposit Insurance Corporation

as Receiver for the Depository Institutions, Wilmington Trust Company, and Citbank N.A. dated

March 11, 2010 (the "Trust Agreement").  The Trust Agreement has an express Delaware choice

of law provision.

109.    Section 3.01 of the Trust Agreement provides that the Seller (*i.e.*, the

Receivership) conveys "all its right, title and interest in and to the Underlying Securities,

including all interest and principal due on or with respect to the Underlying Securities."  This

language is substantially similar to the language of Article 8 of the UCC, which under Delaware law, does not result in a conveyance of claims accruing prior to the sale held by the seller.

110.    If US Bank had performed its duties as trustee, it would have enforced the obligations of the Originator and caused it to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiff's losses.

111.    US Bank's failure to address the Servicer's failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures resulted in increased servicing fees, property tax, and utility expenditures that were borne by the Covered Trusts, a decline in value of the underlying properties and ultimately less sale proceeds for the Covered Trusts and certificateholders.  The overcharging for default-related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Servicer from foreclosure sale proceeds.

112.    If US Bank had met its contractual and statutory duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the Originator to substitute or repurchase all loans where the required documentation was missing or where there were breaches of representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.

113.    US Bank's failure to meet its contractual and statutory duties once it became aware of defaults relating to the numerous representation and warranty breaches further caused harm.  If US Bank had provided notice of representation and warranty violations and defaults

and acted prudently as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Originator to repurchase loans as they were required to do and required the Servicer to pay the damages to the Covered Trusts caused by its improper servicing practices.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Breach of Contract)

114. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

115. The PSAs are valid and binding contracts entered into between US Bank, the depositor, and the seller or sponsor.

116. The PSAs provide, among other things, the terms under which US Bank acts as Trustee for the Covered Trusts.

117. As a former holder of Certificates issued by each Covered Trust, Plaintiff is an express, intended third party beneficiary under the PSAs entitled to enforce the performance of the Trustee.

118. US Bank breached several obligations that it undertook on behalf of Plaintiff as a certificateholder including, without limitation, to:

    (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

    (b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

    (c)    make accurate representations in the "Initial Mortgage Certification," the "Final Certification of the Trustee" and all schedules and attachments thereto;

(d)     protect the interests of the beneficiaries of the Covered Trusts;

(e)     take steps to cause the Originator to repurchase loans lacking adequate documentation;

(f)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsor's and Originator's widespread practice of including in securitization trusts loans which breached such representations and warranties;

(g)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(h)     provide notice of, and take steps to remedy, the Servicer's failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(i)     enforce the repurchase obligations of the originator.

119.    The specific provisions breached by US Bank are further detailed herein.

120.    US Bank's breach of its duties set forth in the PSAs, as described above, directly and proximately caused Plaintiff to incur losses on its Certificates and diminished their value.

121.    Plaintiff has performed their obligations under the PSAs.

122.    US Bank is liable to Plaintiff for the losses it suffered as a direct result of US Bank's failure to perform its contractual obligations under the PSAs.

**SECOND CAUSE OF ACTION**
**(Violation of the Streit Act)**

123.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

124.    As a certificateholder, Plaintiff is a trust beneficiary entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the Trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

36

125.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).  US Bank conducted business with respect to the mortgage investments in New York and many properties underlying the certificates are located in New York.

126.    The PSAs underlying and establishing the Covered Trusts are "indentures," and US Bank is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

127.    Prior to any Event of Default, as described above, US Bank violated the Streit Act by failing to discharge its pre-default obligations with due care.  Further, Events of Default occurred under each Covered Trust shortly after closing.

128.    Section 126(1) of the Streit Act provides that upon an Event of Default the indenture trustee must exercise such of the rights and powers vested in it by the indenture and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

129.    The Streit Act further imposes a duty upon trustees of mortgage trusts to discharge their duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect trust beneficiary rights.

130.    As set forth above, US Bank failed to exercise its rights under the PSAs after becoming aware of defaults and Events of Default by failing to:

> (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;
>
> (b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";
>
> (c)    make accurate representations in the "Initial Mortgage Certification," the "Final Certification of the Trustee" and all schedules and attachments thereto;
>
> (d)    protect the interests of the beneficiaries of the Covered Trusts;

37

(e)     take steps to cause the Originator to repurchase loans lacking adequate documentation;

(f)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsor's and Originator's widespread practice of including in securitization trusts loans which breached such representations and warranties;

(g)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(h)     provide notice of, and take steps to remedy, the Servicer's failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(i)     enforce the repurchase obligations of the originator.

131.   US Bank is liable to Plaintiff for damages incurred as a direct and proximate result of its violations of the Streit Act.

### THIRD CAUSE OF ACTION
**(Violations of the TIA)[6]**

132.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

133.   The PSAs underlying and establishing the Covered Trusts are "indentures," and US Bank is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

134.   As a certificateholder, Plaintiff is a trust beneficiary entitled to the protections afforded under the TIA.

135.   The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

---

[6] As set forth above, Plaintiff includes a TIA claim for purposes of preserving any rights on appeal.

136.    US Bank violated the TIA in at least four ways.  First, TIA Section 315(a) provides that, prior to default (as that term is defined in the indenture), the trustee is liable for any duties specifically set out in the indenture.  15 U.S.C. § 77ooo(a)(1).  As set forth above, US Bank failed to comply with a number of duties set out in the indentures, including its duties to carefully review the mortgage files, to notify certificateholders and other parties of deficiencies, to provide notice of defaults or Events of Default relating to servicing of the loans, to take steps to address those deficiencies, and, most importantly, to enforce the substitution or repurchase of defective loans.

137.    Second, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, US Bank failed to carefully investigate serious known issues with the loans in the trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible party to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

138.    Third, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, US Bank did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties and Servicer defaults and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective

mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

139.    Finally, the TIA states that "[n]otwithstanding any other provisions of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security … shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  US Bank has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which US Bank failed to take action to correct.  In addition, US Bank has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

140.    These breaches materially and adversely affected the interests of the certificateholders, including Plaintiff, because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

141.    US Bank is liable to Plaintiff for damages incurred as a direct and proximate result of its violations of the TIA in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Plaintiff against US Bank for breaches of its statutory and contractual duties in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues triable by jury.


Dated:  August 19, 2015


By:   /s/      David H. Wollmuth

David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
Robert T. Franciscovich
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
rfranciscovich@wmd-law.com
*Attorneys for Plaintiff*